**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **BRADLEY D. TOMPKINS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:11CV00019 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,** | ) | By: James P. Jones United States District Judge |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff. Eric P. Kressman, Regional Chief Counsel, Region III, Edward Tompsett, Assistant Regional Counsel, and Stephen M. Ball, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Bradley D. Tompkins filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2011), 1381-1383d (West 2003 & Supp. 2010). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Tompkins filed for benefits on November 19, 2007, alleging that he became disabled on March 1, 2004. His claim was denied initially and upon reconsideration. Tompkins received a hearing before an administrative law judge ("ALJ"), during which Tompkins, represented by counsel, and a vocational expert testified. The ALJ denied Tompkins' claim, and the Social Security Administration Appeals Council denied his Request for Reconsideration. Tompkins then filed his Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Tompkins was born on December 14, 1976, making him a younger person under the regulations. 20 C.F.R. § 404.1563(c) (2011). Tompkins has an eleventh grade education[1] and has worked in the past as a stocker, a janitor, a construction laborer, and a furniture factory worker. He originally claimed he was disabled due to epileptic seizures, social anxiety disorder, depression, panic disorder, and obsessive compulsive disorder.

[1] Tompkins also has completed two years of masonry training.

From January through August of 2003, Tompkins sought treatment from Kellie Brooks, FNP, for complaints of anxiety and depression. Brooks prescribed Paxil, Prilosec, and Zantac, and scheduled Tompkins for counseling with Kay Weitzman, a licensed social worker. Over the course of his treatment, Tompkins indicated that Paxil helped to control his symptoms.

From February through July of 2003, Tompkins attended counseling with Kay Weitzman, a licensed social worker, for complaints of anxiety and depression. Weitzman reported that, upon initial examination, Tompkins appeared depressed and exhibited short-term memory problems. However, she indicated that Tompkins' mood and anxiety "definitely improved with the addition of Paxil." (R. at 339.) Weitzman assessed a GAF score of 70. [2]

Tompkins sought treatment from James A. Bell, M.D., in March and April of 2004. During this time period, Tompkins complained of panic attacks and anxiety. He denied any feelings of depression. Dr. Bell prescribed Paxil and recommended that Tompkins resume counseling with Weitzman. Tompkins reported significant improvement over the course of his treatment and Dr. Bell

---

[2] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in social, occupational, or school functioning. See Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

noted that Tompkins' panic attacks were "very well controlled on Paxil." (R. at 279.)

On January 31, 2006, Tompkins reported to the emergency room at Lonesome Pine Hospital with complaints of a seizure and a headache. Michael Ford, M.D., stated that the symptoms did not appear to be seizure activity and diagnosed Tompkins with polysubstance abuse. Dr. Ford noted that Tompkins' drug screen was positive for marijuana metabolites and opiates. Tompkins was discharged from the hospital on February 2, 2006.

In April 2006, Tompkins presented to the emergency room at Lonesome Pine Hospital, again complaining of a seizure. Physical and mental examinations were normal and Tompkins was prescribed Dilantin. When Tompkins followed up with Marissa Vito Cruz, M.D., the next month, he reported no seizure activity since he started taking medication on a regular basis.

Tompkins received mental health treatment at Wise County Behavioral Health Sciences beginning in January 2008. In early 2008, Tompkins complained of depression, social anxiety, and panic attacks. He admitted smoking marijuana one to two times per week. Examinations by his case manager, Mary Haynes, BS, revealed that Tompkins was mildly depressed, but alert and oriented. He had no evidence of psychosis or cognitive impairments.

Michael Hartman, M.D., a state agency physician, reviewed Tompkins' medical records in March 2008. He noted that Tompkins had not had seizures since receiving medication, and that he was able to perform many household chores. Dr. Hartman opined that Tompkins had no significant physical limitations and was capable of performing a range of work.

Howard S. Leizer, Ph.D., a state agency psychologist, also reviewed Tompkins medical records in March 2008. He determined that Tompkins had medically determinable impairments of depression and anxiety, but that he would either be not significantly limited, or only moderately limited, in every category of mental workplace activity. (R. at 409-10.) In April 2008, Nisha Singh, M.D., and Elliott Rotman, Ph.D., indicated that they agreed with Dr. Leizer's opinion. Dr. Rotman further opined that Tompkins' mental concerns were "moderate at most," and that he was capable of working in a setting that did not demand a lot of social interaction. (R. at 419.)

In April 2008, Haynes noted positive changes in Tompkins' attitude due to taking Paxil. Ali Garatli, M.D., also stated that Tompkins' "anxiety, and depressive symptom[s] continue[d] to be in remission with the help of medication." (R. at 434.) Throughout the remainder of 2008 and most of 2009, Tompkins continued to do well with Paxil.

In July 2008, Weitzman completed a form regarding Tompkins' ability to perform mental work-related activities. She indicated that Tompkins would have some mild, some moderate, and some marked limitations in his mental work abilities. Weitzman identified "social phobia" as the only factor supporting her assessment.

In October 2008, Julie Jennings, Ph.D., a state agency psychologist, reviewed Tompkins' medical records and determined that Tompkins had medically determinable impairments of depression and panic disorder. However, Dr. Jennings opined that Tompkins could still perform simple, unskilled, non-stressful work.

Shirish Shahane, M.D., a state agency physician, also reviewed Tompkins' medical records in October 2008. Dr. Shahane concluded that Tompkins had no exertional limitations, but was limited to only occasional postural activities such as balancing, stooping, or kneeling.

In November 2008, Misty Bendall, FNP, assessed Tompkins' physical ability to perform work-related activities. She opined that Tompkins could lift no more than five pounds occasionally due to "chronic lumbar" problems, and could sit for no more than thirty minutes. (R. at 490-91.)

In May 2009, Tompkins was seen by Robert S. Spangler, Ed.D., for a consultative examination at the request of his attorney. Dr. Spangler assessed

Tompkins' GAF score as 50. Dr. Spangler indicated that Tompkins would have fair-to-no ability in many mental workplace activities. However, in his narrative report, he indicated that Tompkins was alert and oriented, demonstrated good concentration, was not psychotic, and had average intelligence.

At the administrative hearing held in February 2010, Tompkins testified on his own behalf. Tompkins confirmed that he was able to complete many household chores, such as preparing meals, doing laundry, and caring for his children. James Williams, a vocational expert, also testified. He classified Tompkins' past work as a construction laborer as very heavy, unskilled; his past work as a furniture factory worker as medium, semi-skilled; his past work as a stocker as heavy, semi-skilled; and his past work as a janitor as heavy, unskilled.

After reviewing all of Tompkins' records and taking into consideration the testimony at the hearing, the ALJ determined that he had severe impairments of depression, anxiety, seizure disorder, past history of alcohol abuse, and cannabis abuse in recent remission, but that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Tompkins' limitations, the ALJ determined that Tompkins retained the residual functional capacity to perform a range of medium work that involved lifting and/or carrying 50 pounds occasionally and 25 pounds frequently, and sitting or standing for six hours out of an eight-hour workday.

However, the ALJ stated that Tompkins could not work at unprotected heights, climb ladders, or work around hazardous machinery or vibrating surfaces. He was limited to jobs with simple, routine, repetitive, and unskilled tasks that involve only occasional interactions with the general public and superficial interactions with coworkers and supervisors. The vocational expert testified that someone with Tompkins' residual functional capacity could work as a laundry worker, an amusement park worker, or a groundskeeper/park worker. The vocational expert testified that those positions existed in significant numbers in the national economy. Relying on this testimony, the ALJ concluded that Tompkins was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Tompkins argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly determined Tompkins' residual functional capacity. For the reasons below, I disagree.

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . . " 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB and SSI claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2011). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id*.; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id*. at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig*, 76 F.3d at 589. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Tompkins argues that the ALJ's determination of his residual functional capacity is not supported by substantial evidence. Specifically, Tompkins asserts that the ALJ improperly discounted the opinions of Dr. Spangler, Weitzman, and Bendall.

In weighing medical opinions, the ALJ must consider factors such as the examining relationship, the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record. 20 C.F.R. §§ 404.1527(d), 416.927(d) (West 2011). Although treatment relationship is a significant factor, the ALJ is entitled to afford a treating source opinion "significantly less weight" where it is not supported by the record. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

In the present case, the ALJ considered the opinion of Dr. Spangler, but gave little weight to his assessment, for several reasons. First, Dr. Spangler's

relationship with Tompkins was limited — his opinion is based on a one-time examination, made at the request of Tompkins' attorney. Second, Dr. Spangler's opinion is inconsistent with his own mental status evaluation as well as the other medical evidence of record. For instance, Dr. Spangler assigned Tompkins a GAF score of 50; however, he noted that Tompkins was alert and oriented, cooperative, had adequate recall of recent and remote events, exhibited adequate social skills, and possessed average intelligence and cognitive functioning. (R. at 493-96.) Furthermore, contrary to Dr. Spangler's opinion of debilitating limitations, the medical evidence repeatedly demonstrates that Tompkins' symptoms were well controlled with Paxil. (R. at 277, 279-80, 339, 433, 435, 485, 526-27, 531.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

With respect to Weitzman, the ALJ's assessment of her opinion is also supported by substantial evidence. As a licensed social worker, Weitzman was not an acceptable medical source and therefore her findings do not carry the same weight as a "medical opinion." 20 C.F.R. §§ 404.1513(a), 416.913(a); *see Lilly v. Astrue*, No. 5:10-00750, 2011 WL 4597369, at *4 (S.D. W. Va. Sept. 30, 2011). Moreover, Weitzman's check-list opinion indicating that Tompkins had severe mental limitations was made years after treating Tompkins and is contrary to her own treatment notes. Weitzman observed that Tompkins was anxious, but that his

appearance, behavior, and thought processes were normal. (R. at 248-49.) Over the course of his treatment, Weitzman indicated that Paxil was "really helping" Tompkins and that his "mood and anxiety . . . definitely improved with the addition of Paxil." (R. at 339.)

Finally, substantial evidence supports the ALJ's decision to give no weight to Bendall's opinion that Tompkins had extreme physical limitations. Bendall's findings are not supported by any objective medical evidence. Tompkins' seizure activity was controlled by Dilantin, and he did not experience seizures when taking his medication regularly. Repeated physical and neurological examinations were normal, and the medical records include no findings from treating sources that Tompkins had difficulty walking, sitting, or lifting.

In addition, Bendall's findings are contrary to Tompkins' own statements regarding his physical abilities. While Bendall concluded that Tompkins would be able to lift no more than five pounds, Tompkins stated that he lifts his four-year-old son who weighs around 30 pounds. (R. at 23.) Tompkins also indicated that he was able to perform his own personal care, take care of his children, prepare simple meals, and perform household chores such as laundry, sweeping, vacuuming, and mowing. (R. at 195-96, 221).[3] Tompkins' medical records,

[3] Although Tompkins testified at the hearing that his daily activities were somewhat limited, he reported in his function reports and elsewhere in the record that he

positive response to treatment, and numerous daily activities, all support a finding that he did not have any limitations more severe than those indicated by the ALJ. Accordingly, I find that substantial evidence supports the ALJ's residual functional capacity determination.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: February 6, 2012

/s/ James P. Jones
United States District Judge

---

was able to perform his own personal care, take care of his children, prepare meals, and perform household chores.